IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GILSON PINO,

    Plaintiff,

vs.                                                               Civ. No. 19-435 KK

ANDREW SAUL, Commissioner of the
Social Security Administration,

    Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on Plaintiff Gilson Pino's ("Mr. Pino's") Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 22) ("Motion"), filed November 5, 2019, seeking review of the partially favorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Mr. Pino's claims for Title II disability insurance benefits ("DIB") and Title XVI supplemental security income ("SSI") under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on January 31, 2020, (Doc. 30), and Mr. Pino filed a reply in support of the Motion on March 5, 2020. (Doc. 34.) Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Mr. Pino's Motion is well taken and should be **GRANTED**.

### I.    Background

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 10.)

After completing the tenth grade and earning his General Equivalency Degree, Mr. Pino worked as an emergency medical technician ("EMT"). (Administrative Record ("AR"[2]) 814.) In 1993, at age thirty, he suffered an on-the-job injury while lifting a heavy patient and loading him into an ambulance. (AR 635.) He underwent surgery to repair a herniated disc and returned to work as an EMT until 2008. (AR 045, 635, 814.) He briefly worked as a certified nursing assistant at a nursing home and as a community health representative in a health clinic. (AR 041, 054.) He then worked briefly at a deli, making sandwiches and helping customers, but did not stay in that job because he "couldn't stand too long on [his] feet." (AR 041, 057-58.) Mr. Pino alleges that he became disabled on February 1, 2009 at the age of fifty-three because of chronic lower back pain, depression, anxiety, high blood pressure, and high cholesterol. (AR 064-65, 208.) He last met the insured status requirement of the Social Security Act on December 31, 2014. (AR 015.)

Mr. Pino filed applications for DIB and SSI in January 2016.[3] (AR 081, 208-09, 210-15.) His applications were denied initially in June 2016 (AR 064-76 (DIB-initial), AR 077-90 (SSI-initial)), and again at reconsideration in April 2017. (AR 091-107 (DIB-reconsideration), AR 108-124 (SSI-reconsideration).) Mr. Pino requested a hearing before an Administrative Law Judge ("ALJ") (AR 151-52), and ALJ Raul Pardo held a hearing on July 2, 2018. (AR 037-61.) Mr. Pino appeared in person and was represented by counsel. (AR 037.) The ALJ took testimony from Mr. Pino (AR 040-54) and an impartial vocational expert ("VE"), Nicole King. (AR 037, 054-60.) On August 24, 2018, the ALJ issued a partially favorable decision in which he found that Mr. Pino was not disabled prior to his date last insured ("DLI") of December 31, 2014, thereby making him ineligible for DIB, but that he became disabled on December 14, 2015, making him eligible for

---

[2] Citations to "AR" are to the Administrative Record (Doc. 28) that was lodged with the Court on January 28, 2020.

[3] The record indicates that Mr. Pino filed applications for DIB and SSI in 2010 and 2012 which were denied. (AR 065.)

SSI. (AR 009-28.) Mr. Pino sought review by the Appeals Council, which denied his request. (AR 001-6, 206.) Mr. Pino then appealed to this Court. (Doc. 1.)

## II.      Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In undertaking its review, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2006). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *id.*, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Commissioner's decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III.     Analysis

The ALJ found that prior to December 14, 2015, Mr. Pino had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) with a limitation to occasional balancing and stooping. (AR 018.) Light work requires the ability to lift up to twenty (20) pounds at a time and frequently lift or carry objects weighing up to ten (10) pounds. 20 C.F.R. § 404.1567(b). It also requires the ability to stand and walk for up to six (6) hours in an eight-hour workday and sit for up to two (2) hours. *See id.*; SSR 83-10, 1983 WL 31251, at * 5-6 (Jan. 1, 1983). In essence, then, the ALJ found that the substantial evidence of record supported a determination that Mr. Pino was capable of (1) lifting up to twenty pounds, (2) frequently lifting and/or carrying up to ten pounds, (3) standing and walking for up to six hours a day, *and* (4) sitting for up to two hours a day. *See* 20 C.F.R. § 404.1567(b) ("To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."). Based on the RFC he assessed and the testimony of VE King, the ALJ concluded that Mr. Pino was capable of performing his past relevant work as a fast food worker prior to December 14, 2015 and thus was not disabled as of his DLI.[4] (AR 026, 027.)

Mr. Pino argues that the ALJ erred in arriving at this conclusion. (Doc. 22 at 1.) Specifically, he contends that the ALJ erred in rejecting the medical opinions of his treating doctor,

---

[4] The ALJ found that beginning on December 14, 2015, Mr. Pino would have the additional limitation of being "off task 15% of the time due to pain and unscheduled breaks[.]" (AR 022.) Based on that more restrictive RFC and the testimony of VE King, the ALJ found that Mr. Pino would not be able to perform his past relevant work as of that date. (AR 026.) It is not clear from the ALJ's decision how and why he determined that December 14, 2015 was the date of disability onset. The ALJ's decision appears to suggest that Mr. Pino "reported that he fell and injured himself" on or near that date (AR 023), but the medical record the ALJ cited, and which is dated December 14, 2015, contains no indication that such a report was made to the pain management doctor, Joseph Jaros, M.D., that Mr. Pino saw on December 14, 2015. (*See* AR 469.) Dr. Jaros's treatment record from that date indicates that he was seeing Mr. Pino for a "followup" to Mr. Pino's June 2015 appointment and that he prescribed Mr. Pino a muscle relaxant but refused to increase his hydrocodone dosage at that time. (AR 469.) The Court fails to see—and the ALJ failed to explain—the significance of December 14, 2015 and how the substantial evidence of record supports the ALJ's determination that Mr. Pino came under a disability on that date but no earlier.

4

Roland K. Sanchez, M.D., indicating that Mr. Pino had greater physical functional limitations that would have restricted him to less than sedentary work prior to his DLI. (Doc. 22 at 14-17.) He advances other arguments in support of reversal, as well, but the Court does not reach them, concluding that reversal and remand are required based on Mr. Pino's first claimed error.

### A. Mr. Pino's Relevant Medical History

Mr. Pino's back-related problem is well documented in the medical records. The earliest medical record in the administrative record dates to January 2008[5], when Mr. Pino complained of back pain—which he attributed to his 1993 injury—to his provider at Alamo Navajo Health Center[6] and was prescribed Flexeril, a muscle relaxant, and ibuprofen. (AR 417.) In April 2008, he returned to Alamo Navajo Health Center due to back pain and was prescribed Naprosyn for the pain and Robaxin for reported muscle spasms. (AR 412.) Throughout 2008, he complained of back pain and continued to be treated for "low back pain" and "chronic back pain" with Flexeril and ibuprofen. (AR 397, 398, 402, 408, 410.) In December 2008, his diagnosis was changed to degenerative disc disease, and treatment with Flexeril and ibuprofen was continued. (AR 396.) Mr. Pino continued to be seen at Alamo Navajo Health Center for ongoing treatment of his back pain and muscle spasms throughout 2009. (AR 382-85, 388, 392.) In October 2009, his provider began prescribing tramadol, an opioid pain reliever, and ordered X-rays and an MRI in response to his complaint of "chronic middle back pain." (AR 384-85.) Imaging of Mr. Pino's spine on October 16, 2009 revealed "[m]ild to moderate disc space narrowing" and "[m]ild to moderate degenerative

---

[5] Prior to Mr. Pino's administrative hearing, Mr. Pino's counsel submitted a pre-hearing memorandum to the ALJ, requesting to reopen Mr. Pino's prior application and consolidate it with his 2016 application. (AR 826-27.) The ALJ found good cause to reopen Mr. Pino's prior disability applications that had been previously denied and therefore "considered the medical evidence from 2009 [sic] through the present" in rendering his decision on Mr. Pino's 2016 applications. (AR 013.)

[6] Treatment records from Alamo Navajo Health Center between 2008 and 2011 do not identify who Mr. Pino's providers were when he was seen there during that period. The Court therefore refers to the facility instead of a specific provider in discussing the treatment Mr. Pino received at Alamo Navajo Health Center.

disc disease at L5-S1." (AR 363.) Mr. Pino continued to be seen for "back pain" at Alamo Navajo Health Center in 2010 and 2011. (AR 346, 348, 370, 378, 381.)

In March 2009, Mr. Pino also complained to his primary care physician, Roland K. Sanchez, M.D., about "chronic back pain" related to his 1993 injury and surgery. (AR 549-50.) He was treated with a "series of epidural steroid injections in 2009," which provided him with about one month of pain relief before his pain would return to its pre-injection intensity.[7] (AR 435.) When Mr. Pino continued to complain of back pain in September 2009, Dr. Sanchez referred him for physical therapy and pain management. (AR 553-54.) Dr. Sanchez began prescribing Percocet to Mr. Pino in December 2009. (AR 555.)

When Mr. Pino complained of "back pain traveling to both legs" and pain of 7/10 in July 2010, Dr. Sanchez ordered imaging of Mr. Pino's back. (AR 565, 597-601.) A July 2010 X-ray revealed "narrowing of the L5-S1 disc spaces" and "a lucency projected over the disc space suggesting degeneration of the disc material." (AR 597.) An August 2010 MRI found "[l]oss of intervertebral disc height and desiccation L5-S1" as well as "L5-S1 broad-based disc protrusion/herniation extending posteriorly about 0.7 cm posterior to its expected margin." (AR 601.) Dr. Sanchez continued treating Mr. Pino's back pain with Percocet through at least November 2011. (AR 558, 561, 564, 572, 575, 579, 584.)

The record contains no medical records indicating that Mr. Pino sought or received treatment for back pain in 2012 or 2013.[8] However, in February 2014, Mr. Pino returned to Dr. Sanchez, complaining of a recurrence of "moderate" pain in his back and lower extremities that

---

[7] The record is not clear as to which provider treated Mr. Pino with steroid shots in 2009.

[8] Mr. Pino sought treatment for chronic tension headaches and neck pain in 2012 and 2013. (AR 585, 589.) In March 2012, Dr. Sanchez ordered MRIs of Mr. Pino's brain and cervical spine because of his complaint of "[p]ersistent headaches." (AR 603.)

began in December 2013. (AR 543.) Dr. Sanchez diagnosed "[s]prain or strain of cervical spine," as well as unspecified arthritis, and restarted Mr. Pino's Flexeril prescription. (AR 544.) When Mr. Pino returned in March 2014, Dr. Sanchez changed his diagnosis to "[l]umbago with sciatica of right side[,]" prescribed hydrocodone with acetaminophen, refilled Mr. Pino's Flexeril, and referred him to the Lovelace Pain Clinic. (AR 541-52.)

In April 2014, Mr. Pino established care at Lovelace Rehabilitation Hospital with Pain Clinic specialist Joseph A. Jaros, M.D. (AR 435-36.) He reported to Dr. Jaros that "[t]he pain is worse with lifting heavy objects, standing too long[,] or sitting too long." (AR 435.) Noting Mr. Pino's 2010 MRI results and following a physical examination that revealed "[d]ecreased strength on the left side compared to the right[,]" Dr. Jaros diagnosed Mr. Pino with probable L4-L5 right-sided radiculopathy and suggested epidural steroid injections. (AR 435-36.) Mr. Pino declined injections based on the ineffectiveness of past injections, but he agreed to a prescription for hydrocodone and acetaminophen to manage his pain. (AR 436.)

When Mr. Pino returned to Dr. Jaros for a follow up in June 2014, he reported that his pain was "well controlled with hydrocodone" and that he experienced "greater than 50% pain relief" with the prescribed dosage. (AR 441.) He also reported that he had begun a "wellness program" that consisted of "massage therapy and some stretching exercises," which he said "helped significantly." (AR 441.) However, at a follow-up appointment in August 2014, Mr. Pino reported an increase in pain radiating down his leg that was "worse with activity and unrelieved by his hydrocodone[.]" (AR 445.) Dr. Jaros recommended a trial of an epidural steroid injection, which Mr. Pino agreed to and Dr. Jaros performed. (AR 445.) Dr. Jaros also increased Mr. Pino's hydrocodone dosage. (AR 445.) In September 2014, Mr. Pino reported experiencing nearly 90% relief for the two-and-a-half weeks following the injection but that the pain was gradually

returning, although at a lower level overall. (AR 449.) He also reported feeling nauseated by the increased hydrocodone dosage and asked to return to the lower dosage. (AR 449.) Dr. Jaros performed another steroid injection and lowered Mr. Pino's hydrocodone dosage. (AR 449.) In October 2014, Mr. Pino reported "about 50-60% pain relief" following his last injection. (AR 453.) Dr. Jaros refilled his hydrocodone prescription and prescribed a muscle relaxant at Mr. Pino's request. (AR 453.)

When Mr. Pino returned to the Pain Clinic in January 2015, he reported feeling "approximately 70% better from when he first presented" and taking "minimal pain medications." (AR 455.) Because Mr. Pino "seems to be continuing on an improving trend[,]" Dr. Jaros and Mr. Pino agreed not to administer another injection at that time, although Dr. Jaros refilled Mr. Pino's hydrocodone and muscle relaxant prescriptions. (AR 455.) In late March or early April 2015, however, Mr. Pino experienced an "acute exacerbation of pain" that caused him to seek treatment at an urgent care. (AR 463.) He was given an injection of tramadol and a course of methocarbamol, which did not provide much relief. (AR 463.) He was also seen in April 2015 at Alamo Navajo Health Center for myalgias, muscle spasms, and discomfort in his upper and lower extremities and was observed to have an antalgic gait. (AR 325.) He reported that the medications he was on—Flexeril, ibuprofen, and acetaminophen—were not relieving his pain and that he was scheduled to see his pain management doctor the following month. (AR 325.)

Mr. Pino returned to Dr. Jaros on April 15, 2015 and requested another epidural steroid injection, which Dr. Jaros performed. (AR 463.) Dr. Jaros also increased Mr. Pino's hydrocodone dosage again. (AR 463.) In June 2015, Mr. Pino reported "about 70%-80% pain relief" and requested that his hydrocodone dosage be reduced. (AR 467.) Mr. Pino next returned to the Pain Clinic in December 2015, at which time he reported experiencing increased muscle spasms at night

during the previous two months. (AR 469.) Dr. Jaros prescribed a muscle relaxant and continued him on his same dosage of hydrocodone. (AR 469.)

When Mr. Pino reported ongoing shooting pains in his legs in February 2016, Dr. Jaros ordered an MRI and referred him to Dr. Mark Crawford for a surgical consultation. (AR 473.) An MRI performed on March 3, 2016 found there to be (1) "a large disc bulge with a superimposed large central disc protrusion" that "is displacing the posterior longitudinal ligament posteriorly[,]" (2) "moderate to severe facet joint degenerative change[,]" (3) "posterior displacement of the traversing nerve rootlets," and (4) "moderate to severe bilateral neural foraminal narrowing[,]" all at the L5-S1 segment. (AR 661-62.) Dr. Crawford indicated that Mr. Pino "has failed all conservative treatment" and recommended "lumbar decompression and excision of the herniated disc[.]" (AR 635.) In April 2016, Mr. Pino underwent surgery to address his "[r]ecurrent herniated disc[.]" (AR 510-11, 643.) At his two-week post-operative visit, he reported improvement in his back and leg pain. (AR 643.) In May 2016, he began physical therapy, which made him "more sore," but he reported an overall decrease in his pre-operative pain. (AR 646, 648.) In July 2016, he saw Dr. Sanchez again for worsening back pain and received a non-steroidal injection. (AR 531-33.) At a follow up with Dr. Crawford's office in August 2016, he reported that his leg pain had improved but that he was experiencing restless leg syndrome at night, which prevented him from sleeping more than two hours at a time. (AR 651.) He was prescribed gabapentin and continued on oxycodone. (AR 651.)

In November 2016, he reported to Dr. Sanchez that he was experiencing muscle spasms in his back that caused him "moderate" pain. (AR 674.) Dr. Sanchez prescribed him tizanidine to treat his "muscle pain." (AR 675.) In October and November 2017, he continued to complain to Dr. Sanchez of constant back pain. (AR 734, 741.) Dr. Sanchez referred Mr. Pino to a pain

9

management doctor in November 2017. (AR 736.) In February and April of 2018, Mr. Pino received injections in his back from Dr. Crawford. (AR 048.)

At his administrative hearing in July 2018, Mr. Pino testified, in relevant part, that he is able to sit in one place for a maximum of ten minutes and stand in one place for a maximum of six minutes before his back starts to hurt. (AR 042.) Medication helps control his pain, but if he is not taking medication, the pain returns and is between eight and nine on a ten-point scale. (AR 042.) He cannot walk far or for very long, and he walks slowly, although without a cane. (AR 043.)

### B. Dr. Sanchez's Medical Source Statement

In May 2018, Dr. Sanchez completed a Medical Assessment of Ability to do Work-Related Activities (Physical) ("medical source statement"). (AR 762-63.) He was asked to "consider [Mr. Pino's] medical history and the chronicity of findings as from prior to 12/31/14 to current examination" and "give . . . an assessment of [Mr. Pino's] impairment-related physical limitations." (AR 762.) In relevant part, he opined that Mr. Pino could occasionally lift and/or carry less than ten (10) pounds, frequently lift and/or carry less than five (5) pounds, stand and walk for less than two (2) hours in an eight-hour workday, and sit for less than four (4) hours in an eight-hour workday. (*Id.*) Dr. Sanchez indicated that his lifting/carrying and standing/walking opinions were supported by both "observations" and "records." (*Id.*) He did not document the basis for the sitting limitation he assessed. (*Id.*).

In discussing the medical opinion evidence vis-à-vis the pre-December 14, 2015 RFC he assessed, the ALJ accorded "little weight" to Dr. Sanchez's opinions. (AR 022.) The ALJ found that Dr. Sanchez had not "opined when [he] thought [Mr. Pino's] disability began" and "only documented that [Mr. Pino] was disabled as of the date [he] wrote [his] opinion[], which was well after the established onset date" of December 14, 2015. (AR 022.) He gave two reasons for the

10

weight he assigned to Dr. Sanchez's opinions: (1) "they occurred significantly after the established onset date[,]" and (2) they "limited [Mr. Pino] to sedentary [work], which is inconsistent with the evidence as a whole." (AR 022.) The ALJ provided no further explanation of the weight he assigned Dr. Sanchez's opinions in discussing the RFC he assessed for the period prior to December 14, 2015. (*See* AR 018-22.)

### C. The ALJ Failed to Apply the Correct Legal Standards in Weighing Dr. Sanchez's Opinions

#### 1. Applicable Law

The ALJ's decision must demonstrate application of the correct legal standards applicable to different types of evidence, and failure to follow the "specific rules of law that must be followed in weighing particular types of evidence in disability cases . . . constitutes reversible error." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988). Regarding medical opinion evidence, the ALJ must consider all medical opinions of record and is required to discuss the weight he or she assigns to each opinion. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 404.1527(e)(2)(ii)). Generally, the ALJ should accord more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has rendered an opinion based on a review of medical records alone. *See* 20 C.F.R. § 404.1527(c)(1); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."). A treating source's[9] medical opinions are entitled to—and, in fact, *must* be given—controlling weight if they are "well-supported by

---

[9] "Treating source" is defined as the claimant's "own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2).

medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2); *see* SSR 96-2P, 1996 WL 374188, at * 1 (July 2, 1996)[10] (identifying the four factors that determine whether an opinion is entitled to controlling weight as (1) the opinion comes from a "treating source," (2) the opinion must be a "medical opinion," (3) the opinion is "'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques[,]" and (4) the opinion is "not inconsistent" with the other evidence of record, and explaining that "when all of the factors are satisfied, the adjudicator *must* adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion" (emphasis added)).

The "treating source" rule "recognizes the deference to which a treating source's medical opinions should be entitled." SSR 96-2P, 1996 WL 374188, at * 1. Such deference is warranted because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations[.]" 20 C.F.R. § 404.1527(c)(2). The Social Security Administration is not "permit[ted] to substitute [its] own judgment for the opinion of a treating source on the issue(s) of the nature and severity of an impairment when the treating source has offered a medical opinion that is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." SSR 96-2P, 1996 WL 374188, at * 1.

---

[10] The Court acknowledges that certain Social Security Rulings, including SSR 96-2P, that the Court relies on in its analysis have been rescinded effective for claims filed on or after March 27, 2017. *See* SSR 96-2P, 2017 WL 3928298, at *1 (Mar. 27, 2017). However, Mr. Pino's claims were filed in 2016, making the rescinded rulings and case law interpreting them still applicable.

When the record contains opinions from a treating source, the weighing of medical opinions proceeds through a sequential process: the ALJ must first determine whether the treating source's opinions are entitled to controlling weight. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (describing the analysis as "sequential" and explaining that "[i]n deciding how much weight to give a treating source, an ALJ must first determine whether the opinion qualifies for 'controlling weight'"). SSR 96-2P "contemplates that the ALJ will make a finding as to whether a treating source opinion is entitled to controlling weight." *Watkins*, 350 F.3d at 1300. "A finding at this stage (as to whether the opinion is either unsupported or inconsistent with other substantial evidence) is necessary so that [the reviewing court] can properly review the ALJ's determination on appeal." *Id.* If the opinion is entitled to controlling weight, "no other factors need be considered and the inquiry is at an end." *Anderson v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (unpublished).[11] However, even if not entitled to controlling weight, a treating source's medical opinion "is still entitled to deference and must be weighed using all of the relevant factors." *Langley*, 373 F.3d at 1120 (alteration and internal quotation marks omitted); *see Andersen*, 319 F. App'x at 718 (stating that if either condition entitling an opinion to controlling weight is not met, "an ALJ is not free to simply disregard the opinion or pick and choose which portions to adopt"). "[I]f the ALJ rejects [a treating source's] opinion completely, he must then give specific, legitimate reasons for doing so." *Watkins*, 350 F.3d at 1301 (internal quotation marks omitted). The reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." *Robinson* 366 F.3d at 1082 (internal quotation marks omitted). An ALJ's failure to set forth adequate reasons explaining why a medical opinion was rejected or assigned a particular weight and demonstrate

---

[11] Unpublished decisions are not binding precedent in the Tenth Circuit but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

that he or she has applied the correct legal standards in evaluating the evidence constitutes reversible error. *See Reyes*, 845 F.2d at 244; *Andersen*, 319 F. App'x at 717 ("The agency's failure to apply correct legal standards, or show us it has done so, is grounds for reversal." (alteration and internal quotation marks omitted)).

## 2. Application

The ALJ's decision fails to evince compliance with the foregoing standards for weighing a treating source's opinions. Initially, it cannot be disputed that Dr. Sanchez qualified as a "treating source." The medical records establish that Dr. Sanchez treated Mr. Pino frequently and on dozens of occasions between at least 2008 and 2018. He was familiar with Mr. Pino's physical ailments, as well as his mental health conditions, and actively treated Mr. Pino's various conditions on an ongoing basis. He managed Mr. Pino's medications, referred him to specialists, and ordered diagnostic testing and imaging to address not only Mr. Pino's complaints of back pain but other conditions as well.[12] There can be little doubt that, on the record in this case, Dr. Sanchez was in a unique position to provide a "longitudinal picture" of Mr. Pino's impairments, in general, and opinions regarding Mr. Pino's physical functional limitations resulting from his degenerative back condition, specifically. Dr. Sanchez's treating source opinions were particularly critical in this case given that the State Agency physicians who reviewed Mr. Pino's DIB and SSI applications initially and on reconsideration in 2016 and 2017, respectively, both concluded that there was "insufficient evidence to make a medical assessment prior to [DLI]." (AR 068[13], 102[14].) It is precisely Dr.

---

[12] *See, e.g.*, AR 603 (results from MRIs of Mr. Pino's brain and cervical spine that Dr. Sanchez ordered based on Mr. Pino's complaint of persistent headaches).

[13] Notably, Dr. Kavitha Reddy, who reviewed Mr. Pino's DIB and SSI claims at the initial level, did not include a physical RFC assessment (i.e., exertional, postural, and other physical limitations) in the DDE for DIB but included one in the DDE for SSI. (*Compare* AR 068, *with* AR 084-86.)

[14] At the reconsideration level, Dr. Joyce Goldsmith stated in her "Additional Explanation" of the RFC she assessed, "Based on the evidence in [the] file, the prior assessments of light . . . for current and IE for DIB are reaffirmed." (AR

Sanchez's history as Mr. Pino's treating doctor that allowed him, when asked in 2018 to assess Mr. Pino's physical functional abilities "as from before 12/31/2014 to current examination[,]" to render opinions as to Mr. Pino's limitations.

Despite this, and despite the ALJ's recognition of Dr. Sanchez as Mr. Pino's "primary care physician" and one of the sources of "treating opinions in the record" (AR 020, 021-22), the ALJ failed to perform a threshold controlling-weight analysis of Dr. Sanchez's treating-source opinions. Absent from his decision is any indication that he considered whether Dr. Sanchez's opinions were "well-supported" by medically acceptable clinical and laboratory diagnostic techniques and "not inconsistent" with the other substantial evidence of record. Indeed, the only reasons the ALJ gave for rejecting Dr. Sanchez's opinions—that they (1) "occurred significantly after the established onset date" and (2) "limited [Mr. Pino] to sedentary [work], which is inconsistent with the evidence as a whole" (AR 022)—are not only legally inadequate but also demonstrate that the ALJ failed to apply the correct legal standards for weighing Dr. Sanchez's opinions. The Court briefly explains.

First, the mere fact that Dr. Sanchez rendered opinions after Mr. Pino's DLI is not a proper basis for rejecting them. *When* an opinion is rendered is neither one of the two factors to be considered in determining whether the opinion is entitled to controlling weight, *see* 20 C.F.R. § 404.1527(c)(2), nor one of the enumerated factors for weighing a noncontrolling opinion. *See* 20 C.F.R. § 404.1527(c)(1)-(5) (setting forth specific factors to be considered in weighing any medical opinion, comprising (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization). The ALJ's decision also provides no

---

102.) The Court understands "IE" to stand for "insufficient evidence" given that Dr. Reddy's "prior assessment" at the initial level concluded that there was "insufficient evidence to make a medical assessment prior to [DLI]." (AR 068.)

explanation regarding how the timing of Dr. Sanchez's opinions even arguably qualifies as an "other factor" under 20 C.F.R. § 404.1527(c)(6), much less justifies the wholesale rejection of Dr. Sanchez's opinions. Furthermore, the ALJ's finding that Dr. Sanchez's opinions "only documented that [Mr. Pino] was disabled as of the date [he] wrote [his] opinion[]" (AR 022) is not supported by substantial evidence.[15] Dr. Sanchez's medical source statement expressly provided that he considered Mr. Pino's earlier medical history, i.e., prior to December 31, 2014, in assessing Mr. Pino's limitations. Nowhere does the statement indicate that the opinions contained therein assessed limitations only as of May 2018 and beyond. It is entirely possible that Dr. Sanchez intended his assessment to reflect his opinions about Mr. Pino's limitations as of an earlier point in time, including prior to Mr. Pino's DLI. At the very least, the evidence is unclear regarding to what time period Dr. Sanchez's opinions regarding Mr. Pino's physical functional limitations apply. Given the critical importance of those opinions, the ALJ should have contacted Dr. Sanchez to seek clarification on that issue. *See Robinson*, 366 F.3d at 1084 ("If evidence from the claimant's treating doctor is inadequate to determine if the claimant is disabled, an ALJ is required to recontact a medical source, including a treating physician, to determine if additional needed information is readily available.").

Second, the ALJ's finding that Dr. Sanchez's opinions were "inconsistent with the evidence as a whole" is inadequate to support his rejection of the opinions. The ALJ did not identify a single piece of evidence that is purportedly "inconsistent" with the limitations assessed by Dr. Sanchez. A conclusory finding that an opinion is inconsistent with the record is plainly

---

[15] The ALJ's finding that Dr. Sanchez "documented" that Mr. Pino "was disabled" does not accurately reflect the record. In his 2018 medical source statement, Dr. Sanchez assessed specific physical functional limitations based on his familiarity with Mr. Pino's back impairment. (AR 762.) Nowhere in that statement or elsewhere in the record did Dr. Sanchez opine or "document" that Mr. Pino "was disabled," an issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1). While Dr. Sanchez's opinions, properly considered, may support an ultimate determination that Mr. Pino "was disabled" prior to his DLI, the ALJ's mischaracterization of Dr. Sanchez's opinions in this respect further evinces the deficiency of the ALJ's handling of the opinions.

16

inadequate to support rejection of the opinion. *See Langley*, 373 F.3d at 1119 (explaining that an ALJ's reasons for assessing a treating source's medical opinion must be sufficiently specific for meaningful judicial review); *Lewis v. Berryhill*, 690 F. App'x 646, 647-48 (10th Cir. 2017) (unpublished) (concluding that the ALJ's finding that a treating physician's opinion was "inconsistent with other medical evidence" was "too vague" where the ALJ did not identify with which part of the record the opinion was purportedly inconsistent). Moreover, the correct standard for determining whether Dr. Sanchez's opinions were entitled to controlling weight is not whether his opinions were "inconsistent" with the substantial evidence of record but rather whether they were "*not* inconsistent." *See* 20 C.F.R. § 404.1527(c)(2) (emphasis added). "Not inconsistent" is "a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." SSR 96-2P, 1996 WL 374188, at * 3. In other words, Dr. Sanchez's opinions could have been "inconsistent" with other evidence and still entitled to controlling weight, so long as his opinions were not contradicted by other *substantial* evidence of record. The ALJ's failure to identify any evidence, much less substantial evidence, that purportedly contradicted or conflicted with Dr. Sanchez's opinions leaves the Court unable to say that the ALJ's refusal to accord controlling weight to Dr. Sanchez's opinions was proper.[16]

---

[16] The Court recognizes that State Agency physician Dr. Goldsmith, who reviewed Mr. Pino's DIB and SSI applications at the reconsideration level in April 2017, appears to have opined that Mr. Pino was capable of "light" work prior to his DLI based on the physical RFC assessment she included in the DDE for DIB. (*See* AR 100-101.) Confusingly, however, Dr. Goldsmith also "reaffirmed" the June 2016 initial assessment of State Agency physician Dr. Reddy that there was insufficient evidence to make a medical assessment of disability in Mr. Pino's DIB claim. (*See* AR 068, 102.) The ALJ's decision—which referred generally to the "State Agency physician opinions" and made no attempt to distinguish between the four separate, nonidentical DDEs of record from two different physicians—fails to acknowledge, let alone reconcile, this material inconsistency. Moreover, even assuming *arguendo* that Dr. Goldsmith's internally inconsistent assessment could be said to "contradict" Dr. Sanchez's opinions, the ALJ was not free to reject Dr. Sanchez's opinions in favor of a non-examining source's opinions without providing adequate reasons for doing so. *See* SSR 96-6P, 1996 WL 374180, at *2 (July 2, 1996) (explaining that "the opinions of

Indeed, the Court's review of the record indicates that the substantial evidence of record is consistent with and supports Dr. Sanchez's opinions regarding Mr. Pino's physical functional limitations, including if one assumes the opinions apply to the period prior to Mr. Pino's DLI. The uncontroverted evidence established that Mr. Pino (1) suffers from a degenerative back condition that was confirmed—through *objective* medical evidence (MRIs and X-rays[17])—to have deteriorated between October 2009 and July/August 2010, and again between July/August 2010 and March 2016; (2) was treated with epidural steroid injections and/or narcotic pain medications for at least four of the six years prior to his DLI; (3) regularly saw and was treated by a pain specialist for more than the year-and-a-half immediately preceding his DLI, as well as for more than a year thereafter; (4) was observed upon physical examination in April 2014 (prior to DLI) to exhibit decreased strength in his left lower extremity and in April 2015 (shortly after DLI) to have an antalgic gait; (5) underwent a second back surgery within a year-and-a-half after his DLI when it was determined that the "conservative" treatments (i.e., injections and pain medications) he had been on for years were no longer effective; (6) continued to have back pain, receive injections, and take prescription pain medication even after his 2016 surgery; and (7) has consistently complained that sitting and standing are the activities that cause him pain and discomfort.[18] In light of the

---

physicians . . . who do not have a treatment relationship with the individual are weighted by stricter standards" and that "the opinions of State agency medical . . . consultants . . . can be given weight only insofar as they are supported by evidence in the case record"). The ALJ's decision contains no explanation whatsoever of how Dr. Goldsmith's opinions are supported by the evidence in the record. (*See* AR 022.)

[17] The Social Security Regulations define "objective medical evidence" as meaning "signs, laboratory findings, or both[,]" 20 C.F.R. § 404.1502(f), and "laboratory findings" as meaning "one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" including "medical imaging (such as X-rays)[.]" 20 C.F.R. § 404.1502(c).

[18] In *Baca v. Department of Health & Human Services*, 5 F.3d 476, 479 (10th Cir. 1993), the Tenth Circuit explained that "evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date[.]" *Id.* (alteration, quotation marks, and citation omitted). Despite the obvious relevance of the post-DLI evidence in this case, i.e., the evidence regarding the continuing deterioration of Mr. Pino's back and his

foregoing evidence, it was incumbent upon the ALJ to identify, with specificity, substantial evidence that contradicted or conflicted with Dr. Sanchez's opinions if he intended to reject them. He failed to do so, leaving the Court unable not only to follow his reasons for rejecting Dr. Sanchez's opinions but also to say that he applied the correct legal standards in evaluating the evidence in this case.

Overall, the ALJ's decision fails to demonstrate that he weighed Dr. Sanchez's opinions in accordance with the correct legal standards for weighing a treating source's medical opinions. As such, his decision must be reversed and remanded. *See Watkins*, 350 F.3d at 1300, 1301.

### D. The Court Does Not Reach Mr. Pino's Other Arguments

Because the Court concludes that remand is required as set forth above, the Court will not address Mr. Pino's remaining claims of error. *See Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court does not reach issues that may be affected on remand).

### IV.   CONCLUSION

For the reasons stated above, Mr. Pino's Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 22) is GRANTED.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent

---

eventual second back surgery, the ALJ's discussion of the evidence supporting the first RFC he assessed (for prior to December 14, 2015) evinces consideration of medical records only through October 2015. (AR 020-21.)